## Commonwealth *vs.* Richard DiGiacomo.

No. 01-P-76.

Middlesex. March 13, 2002. - February 6, 2003.

Present: Laurence, Smith, & Mills, JJ.

*Indecent Assault and Battery. Evidence,* State of mind, Cross-examination, Fresh complaint, Privileged communication, Communication between patient and psychotherapist, Relevancy and materiality, Impeachment of credibility, Reputation. *Witness,* Cross-examination, Credibility. *Privileged Communication. Practice, Criminal,* Disclosure of evidence.

At the trial of indictments charging the defendant, a vice-principal of a middle school, with a series of sexual assaults on female students, the judge erred in admitting in evidence, under the state of mind exception to the hearsay rule, testimony by a teacher regarding her conversation with the defendant, in which she discussed with him statements made by female students concerning his conduct, where the conversation did not relate to any future sexual assaults by the defendant, but, at most, related to past alleged sexual assaults; however, the error was not prejudicial, where the evidence was merely cumulative of the one victim's testimony; where the judge instructed the jury that they could consider the evidence only as to those indictments concerning that victim; and where the defendant was found not guilty on indictments charging him with sexual assaults on other female students. [319-321]

At a criminal trial, the judge did not err in declining to strike a witness's answer to a question posed by defense counsel on recross-examination, where the answer did not go beyond what was reasonably foreseeable in light of the question asked, and where the answer did not contradict the Commonwealth's pretrial representation concerning the substance of the witness's testimony. [321-322]

At the trial of indictments charging the defendant, a vice-principal of a middle school, with a series of sexual assaults on a female student (victim), the judge's exclusion from evidence of certain notations on the victim's treatment records indicating that the victim had engaged in prior instances of fabrication did not create a substantial risk of a miscarriage of justice, where there was no evidence that the victim's fabrications had any relationship whatsoever to the charges against the defendant, and where the excluded notations did not establish that the victim was somehow biased against the defendant or had a motive to lie about his assaults on her. [322-324]

A criminal defendant failed to demonstrate that the trial judge erred in excluding certain testimony, for which the defendant failed to provide an adequate

foundation, about the child victim's reputation for veracity; that the trial judge erred in excluding from evidence an unsubstantiated and irrelevant report by the Department of Social Services concerning the victim; or that the trial judge erred in concluding that the Commonwealth had not violated a pretrial discovery agreement. [324-325]

INDICTMENTS found and returned in the Superior Court Department on April 3, 1997.

The cases were tried before *Judith A. Cowin*, J.

*Juliane Balliro* for the defendant.

*Loretta M. Lillios*, Assistant District Attorney (*Shelia M. Calkins*, Assistant District Attorney, with her) for the Commonwealth.

SMITH, J. On March 18, 1997, a Middlesex County grand jury returned multiple indictments charging the defendant with a series of sexual assaults upon six complainants. The charges arose during the time that the defendant served as vice-principal of the Brooks Hobbs Middle School (Brooks Hobbs) in Medford. The complainants were six young girls who were students at the school.

A Superior Court jury returned guilty verdicts on four indictments in regard to two of the complainants, Maura and Nicole.[1] The defendant was found not guilty on the indictments charging him with sexual assaults on three other complainants; an indictment naming a sixth student as a complainant was the subject of a nolle prosequi prior to trial.

On appeal, the defendant claims that the judge committed error by (1) admitting prejudicial and irrelevant hearsay; (2) excluding notations in treatment records referring to Nicole's lack of veracity; (3) excluding evidence of Nicole's reputation for lack of truth and veracity; and (4) prohibiting the defendant from inquiring of Nicole about sexual assault allegations made against her. The defendant also claims that in discovery the Commonwealth improperly failed to disclose two oral statements made by the defendant that were later used at trial.

*Facts*. We recite the facts as the jury could have found them, reserving certain details for discussion in conjunction with the issues raised.

[1]We use pseudonyms for the names of the victims.

1. *Facts regarding Nicole.* The defendant was charged in regard to Nicole with two counts of child rape, one count of assault of a child under the age of sixteen with intent to commit rape, four counts of indecent assault and battery on a person having reached the age of fourteen, and three counts of indecent assault and battery on a child under the age of fourteen. The Commonwealth entered a nolle prosequi on one count of child rape, the charge of assault with intent to rape, and one count of indecent assault and battery. The jury returned guilty verdicts on two of the counts of indecent assault and battery and not guilty verdicts on the remaining counts.

Nicole was born in January of 1982, and came to the United States from Haiti in 1994. Along with her younger brother, Nicole went to live with a Haitian foster family in Medford. She spent her entire fifth and sixth grade years at Brooks Hobbs.

Nicole first met the defendant in the middle of her fifth grade year. By that time, both of her parents were dead and she was a ward of the Department of Social Services (DSS). The defendant befriended Nicole and she began visiting him in his school office several times each day. Often, the defendant would summon her to his office for visits during home room time, during and after lunch, during academic classes, and after the school day. During the visits, the defendant would sometimes close his office door. On some occasions, Nicole would ask the defendant for lunch money. He lent her small amounts but never asked her to repay him. At other times, the defendant gave Nicole gifts of money in amounts of twenty, fifty, eighty, and ninety dollars.

When the defendant was not present in his office, Nicole would enter the defendant's office and wait for him. Sometimes she searched through his desk for money, snacks, or hand lotion. Shirley Kountze, the principal of Brooks Hobbs, spoke to the defendant about Nicole being in his office when he was not there. The defendant told Kountze that he gave Nicole permission to be in his office when he was absent. Kountze told the defendant that she did not want students visiting his office unsupervised. Later, Kountze had to speak to the defendant a second time when she again caught Nicole going through the defendant's desk when he was not there.

The defendant gave Nicole his home telephone number and

at times she would telephone him and ask him to bring her to his home in Medford. During her fifth and sixth grade years, Nicole and her brother would often go to the defendant's home to play pool. The defendant admitted that, with a single exception, he was the only adult at his home on those occasions.

Nicole would also telephone the defendant to ask for rides to a shopping mall and he would agree to her requests. On those occasions, he would usually not park his car outside her house but would wait around the corner. Once at the mall, his routine was to drop Nicole off and instruct her to telephone him when she was ready to be driven home.

According to Nicole, the defendant first began to sexually assault her when she was in her fifth grade year. The first incident occurred after she entered the defendant's office. The defendant closed the door behind her, and while Nicole sat in a chair, he opened her shirt and felt her breasts. The sexual assaults occurred about once a week when Nicole was in the fifth grade and about once every other week when she was in the sixth grade. The incidents occurred not only in the defendant's office but also in his home and in his car. The defendant told Nicole not to tell anyone, that his children would be angry at him, and that he would go to jail.

Matias Gonzales, Nicole's DSS social worker, spoke with Nicole's foster mother on May 22, 1996, about the relationship between Nicole and the defendant. As a result of that conversation, Gonzales contacted the defendant and asked him why he was giving money to Nicole. The defendant explained that he liked to help poor children. Gonzales told the defendant to stop giving money to Nicole, that she was in DSS custody, that she had problems, and that his gifts were confusing to her.

In October of 1996, Nicole left Medford to live with another foster family in Brockton and attended Brockton High School. The defendant mailed letters to Nicole at her new foster home and at her new school, enclosing cash and stamps, and imploring her to write back to him.

Just prior to Thanksgiving in 1996, Gwendolyn Blackburn, director of an English program at Brooks Hobbs, learned about

the money and gifts that the defendant had been giving to Nicole and confronted him privately. The defendant explained that he was just being kind and friendly. Blackburn told the defendant that his relationship with Nicole was too close and that it was improper for an educator to give gifts and money to a student.

Nicole spent the Thanksgiving weekend in 1996 with her brother and her first foster family in Medford. On the day after Thanksgiving, Nicole telephoned the defendant and asked him to take her shopping. The defendant picked up Nicole and her brother and brought them to his house. He was the only adult there. While her brother played pool in the basement, Nicole watched television in the living room. At that time, according to Nicole, the defendant told her that she was pretty and that he loved her. The defendant approached her on the couch and unfastened her bra. When Nicole's brother came upstairs unexpectedly, the defendant pretended to be tidying up the house. Nicole went to the bathroom and fixed her clothes. The defendant then gave Nicole about ninety dollars and drove her and her brother to the mall. The defendant waited in the car for forty-five minutes while the children shopped. Then he drove them back to the Medford foster home.

The next day, when Nicole returned to her second foster home, she had new purchases from the money the defendant had given her, including shoes, a jewelry box, perfume, clothes, and holiday gifts for friends. After inquiring of Nicole as to the source of the gifts, Nicole's second foster mother telephoned the defendant about the money. The defendant initially denied that he had given any money to Nicole, but when the foster mother informed the defendant that Nicole had told her "everything," the defendant admitted he had given Nicole the money. He also apologized and lamented that he was "so ashamed."

After this telephone call, the second foster mother had another conversation with Nicole. Nicole began crying and disclosed that the defendant had sexually molested her. Nicole initially told her second foster mother, as well as investigators, that when the defendant sexually abused her, he slapped her, tied

her up, and taped her mouth.[2] The second foster mother reported the abuse to the authorities the following Monday morning.

After the Thanksgiving holiday, the defendant arranged an emergency meeting with the superintendent of schools and told him that he was under investigation for sexually assaulting Nicole but that he was innocent. He admitted to the superintendent that Nicole had called him over the weekend, that he had picked her and her brother up and brought them to his house to play pool, and that he had given Nicole thirty-five dollars. He also admitted that he was the only adult that was home at the time. He claimed to have refused to give Nicole a ride home and told her to get home by herself.

2. *Facts regarding Maura.* The defendant was charged with, and found guilty of, two counts of indecent assault and battery on a child under the age of fourteen with regard to Maura. Maura was born in April, 1982. Her family had just moved to Medford and she met the defendant on her first day of sixth grade at Brooks Hobbs. Maura came to know the defendant by going to his office every Monday to get her lunch tickets.

When Maura was in her seventh grade year (the 1994-1995 school year), the defendant selected her for the privilege of running errands for the office. He would call her to his office by using the public announcement system or by personally retrieving her from the classroom. During her first semester, the defendant called Maura out of English class every day and often called her out of math class.

Sometimes, when the defendant would ask Maura to come into his office, he would close the door and tell her that she looked nice, had a nice body, and had great skin. He would ask to hug her and kiss her on the cheek in exchange for candy. Seated in his chair with wheels, the defendant would inch his chair forward and reach around Maura, with one hand touching her buttocks and the other cupping her breast. A few times, when no one was around, the defendant patted her buttocks in the hallway and in the cafeteria. At the beginning, the defendant touched Maura this way once per week. Maura was very

---

[2]At trial, Nicole admitted that those details were lies. Nicole said that she lied because she thought she would be more readily believed than if she disclosed the ongoing sexual molestations.

uncomfortable, but did not tell anyone about the defendant's conduct.

In the second semester of that year, Maura, along with four other girls (who were not identified), approached two teachers, Doris Hancock and Theodora Koch, to discuss the defendant's behavior. At the teachers' suggestion, the girls, including Maura, met with the defendant. Maura told the defendant that his actions were inappropriate and made her "really uncomfortable." The defendant said that he did not realize that his actions made Maura uncomfortable, that he was sorry, and that he would call Maura's parents to explain. The defendant never telephoned Maura's parents.

Subsequently, Maura avoided the defendant and he did not ask her to do errands for him again.

3. *The defense.* The defendant's theory of the case was that Nicole and Maura and the other complainants had made up the sexual aspect of their relationship with the defendant.

In furtherance of the defense, portions of Nicole's treatment records were introduced in evidence.[3] The records disclosed that Nicole had experienced hallucinations, had displayed paranoia and delusions, and also had depression. The defendant called as an expert a psychologist who interpreted the records. Several witnesses testified that the defendant had a reputation for truthfulness. In addition, the defendant testified in his defense.

The defendant in his testimony admitted that Nicole was in and out of his office constantly and that she would telephone him at home on a regular basis. The defendant denied giving permission to Nicole or anyone else to go into his office or to go through his desk. The defendant admitted that Nicole's first foster mother had asked him not to pick the children up, yet he continued to do so, meeting them on the corner rather than at their front door.

Regarding the alleged incident that occurred on Thanksgiving weekend, the defendant testified to meeting Nicole and her brother without seeking permission from either foster family. He also admitted to taking Nicole shopping, bringing her to his

---

[3]Nicole had been in treatment with a therapist, Janice Lovejoy, for a one-year period during the time the defendant was allegedly assaulting her. We explain later in this opinion how the defendant obtained the records.

home, and giving her about fifty dollars. The defendant testified that he lied to Nicole's second foster mother about giving Nicole the money so that Nicole would not get into trouble.

The defendant testified that, for a short time, Maura did run errands for the office. The defendant testified that he rescinded this privilege after she acted "loud and silly." He claimed that he was never alone with Maura and that he never touched her inappropriately. The defendant also stated that Hancock and Koch met with him for the purpose of offering him their support. He testified that when Maura confronted him, he promised to stop hugging her. The defendant also explained that he did not contact Maura's father because Maura declined the defendant's offer to sit down with her and her father to discuss the matter.

4. *The rebuttal.* Janice Lovejoy, Nicole's therapist, testified as a rebuttal witness. Lovejoy stated that her ongoing diagnosis of Nicole was depression, but that during the entire period of treatment, Nicole's mental status remained stable and she functioned appropriately on a day-to-day basis.

On June 6, 1996, after treating Nicole for six months, Lovejoy telephoned the defendant at Brooks Hobbs and asked him about the sums of money he had been giving Nicole. In response, the defendant stated only that a note was posted on the school bulletin board indicating that Nicole owed $22.50 for a book that she had to return before she could graduate.

*Discussion.*

1. *Claims of erroneous evidentiary rulings.* The defendant claims that the judge made several erroneous evidentiary rulings that deprived him of a fair trial.

a. *Admission of hearsay.* Hancock testified that after she (and Koch) met with Maura and the others, Hancock went to speak with the defendant. The judge allowed Hancock to testify, over objection, as to the contents of her conversation with the defendant. Hancock testified that she told the defendant that "the girls had come to [Hancock and Koch] saying that they felt uncomfortable in [the defendant's] presence, and they had spoken of being hugged and being touched and felt uncomfortable." According to Hancock, the defendant asked for the names of the girls who attended the meeting and when told one name, responded that he had known that girl since she was a child.

The judge allowed Hancock's testimony in evidence for the purpose of showing the defendant's state of mind and limited its use to the indictments naming Maura as the complainant.

On appeal, the defendant argues that the evidence did not qualify under an exception to the hearsay rule because the conversation took place after the defendant's alleged sexual assaults on Maura and because Hancock's testimony was not relevant to any issue in the case. We agree and hold that Hancock's testimony as to her conversation with the defendant was not admissible.

"Statements of a victim of a crime made prior to the event may be admissible in order to prove a motive or relevant state of mind of the defendant, if there is evidence they were communicated to the defendant." Liacos, Massachusetts Evidence § 8.2.2 (7th ed. 1999). Here, any statement made by Maura or the others to Hancock did not relate to any future sexual assaults by the defendant on Maura; at most, they related to past alleged sexual assaults.

The defendant's equivocal response to Hancock's statement regarding the conversations at the meeting with Maura and the other girls did not meet a state of mind exception to the hearsay rule because the statements faced "backward." See *Commonwealth* v. *Seabrooks*, 425 Mass. 507, 512 (1997) ("Allowing hearsay statements generally under the state-of-mind exception would entirely eviscerate the hearsay rule and its important purpose of securing the correctness and completeness of testimony through cross-examination").

We next consider whether the improper admission of the evidence constituted prejudicial error. Under that standard, we consider whether "the error possibly weakened [the defendant's] case in some significant way so as to require a new trial." *Commonwealth* v. *Daggett*, 416 Mass. 347, 352 n.5 (1993), quoting from *Commonwealth* v. *Schulze*, 389 Mass. 735, 741 (1983).

Hancock's testimony about her conversation with the defendant was cumulative of Maura's testimony as to her own conversation with the defendant. "Generally, '[t]he mistaken admission of hearsay evidence, if merely cumulative of another witness's testimony, does not constitute reversible error.' " *Commonwealth* v. *Dunn*, 56 Mass. App. Ct. 89, 94 (2002), quot-

ing from *Commonwealth* v. *O'Connor*, 407 Mass. 663, 670 (1990).

As the defendant points out, however, Hancock testified that she told the defendant that "other girls" in addition to Maura were at the meeting with her and Koch. According to the defendant, the reference to "other girls" prejudiced him because it strengthened the Commonwealth's case in regard to Maura's claims. We reject the defendant's argument.

At the request of defense counsel, the judge instructed the jury that Hancock's testimony could be considered only as to those indictments naming Maura as a complainant. The judge further instructed the jury that they were not to speculate about the identity of the other girls present or what they said at the meeting, and that the jurors were not to draw any inference against the defendant from the fact that other girls accompanied Maura to the meeting with Hancock and Koch. The jury is presumed to have followed the judge's instructions. *Commonwealth* v. *Robicheau*, 421 Mass. 176, 180 (1995). We also note that the defendant was found not guilty on the indictments charging him with sexual assaults on other young girls. Therefore, we are sure that the error "did not influence the jury, or had but very slight effect." *Commonwealth* v. *Flebotte*, 417 Mass. 348, 353 (1994), quoting from *Commonwealth* v. *Peruzzi*, 15 Mass. App. Ct. 437, 445 (1983).

The defendant also claims that the judge committed error when she refused to strike Hancock's answer to a question posed by defense counsel on recross-examination.

On direct and redirect examination, Hancock did not testify in any specific detail as to her conversations with Maura and the others at the meeting that she and Koch had with them. On recross-examination, defense counsel asked Hancock, "[Maura] didn't tell you that day that [the defendant] had touched her breast, did she?" Hancock responded that Maura at the meeting may have referred to her "chest" and to "body parts."[4] Defense counsel moved to strike the answer but the judge denied the motion.

[4]Koch was called as a defense witness and denied that Maura or any of the others at the meeting with her and Hancock mentioned "chest" or "body parts."

We do not think that Hancock's answer went beyond what was reasonably foreseeable in light of the question posed by defense counsel. See *Commonwealth* v. *Perez,* 405 Mass. 339, 344-345 (1989). Obviously, defense counsel asked the question in an attempt to impeach Maura's credibility. "The defendant[] may not now be heard to cry foul over evidence that [he] purposefully introduced and tried to use to [his] advantage." *Commonwealth* v. *Chaleumphong,* 434 Mass. 70, 76 (2001).

The defendant argued to the judge that defense counsel asked the question because he relied on the Commonwealth's pretrial representation that Hancock could not remember what Maura said at the meeting. The judge expressly found that Hancock never told the Commonwealth that Maura had mentioned at the meeting that the defendant touched her "chest" and "body parts." Thus, the Commonwealth was unaware of that portion of her testimony. We also note that the Commonwealth did not tell the judge and defense counsel at a pretrial hearing that Hancock would testify that Maura did not say anything at the meeting; rather, the prosecutor stated that Hancock could not *recall* what Maura said at the meeting.

Finally, we reject the defendant's argument that as a result of her answer to defense counsel's question, Hancock became a fresh complaint witness. The judge did inquire if the defendant wanted a limiting instruction. The defendant declined, conceding that Hancock's testimony was not fresh complaint.

b. *The redactions from Nicole's treatment records.* Prior to trial, the defendant filed a motion pursuant to *Commonwealth* v. *Bishop,* 416 Mass. 169, 179-183 (1993), seeking access to Nicole's treatment records that had been compiled by Lovejoy during her treatment of Nicole from December, 1995, through October, 1996. At the time of the motion, *Commonwealth* v. *Bishop, supra,* required defendants in sexual assault cases to follow a five-stage procedure if they wanted to have access to treatment records of complainants. Here, defense counsel, as a result of favorable rulings in the first three stages of the procedure, had been allowed to examine Nicole's treatment records.

After examining Nicole's treatment records, the defendant filed a Stage Four motion requesting the trial judge to rule that

the disclosure of specific portions of Nicole's records to the fact finder was needed in order to provide the defendant a fair trial. The Commonwealth objected, in part, to the defendant's motion.

The judge conducted a hearing, in camera, after which she ruled that certain portions of Nicole's records could be disclosed to the jury. The judge, however, excluded three notations from being considered by the jury, and the defendant claims error.

The excluded notations are referred to by the defendant in his Stage Four motion as "Lying References." As summarized in the motion, they are:

"1. A patient note indicates 'lies.' . . ."

"2. A therapy goal is to decrease impulsivity (i.e. . . . lying to no more than 1 x monthly[)]. . . ."

"3. 'Non-trustful of adults leads to lying, manipulation, paranoia and aggressive behavior.' . . ."

In his motion, the defendant claimed that Lovejoy's opinion, as shown in the treatment records, that Nicole lied was admissible as expert testimony. The judge excluded the notations because there was no evidence that the prior instances of fabrication were related to the charges for which the defendant was being tried. On appeal, the defendant claims that the notations were admissible because they showed Nicole's lack of veracity and supported the view that Nicole was biased or had a motive to lie.

"Stage Four requires that the defendant demonstrate that disclosure of the relevant portions of the records to the trier of fact is required to provide the defendant a fair trial." *Commonwealth* v. *Sheehan*, 435 Mass. 183, 187 (2001). The judge is to "resolve any doubt . . . in the defendant's favor." *Commonwealth* v. *Bishop*, *supra* at 183. Because the defendant did not object at trial to the exclusion of the notations, if we find error, we review it under the substantial risk of a miscarriage of justice standard. See *Commonwealth* v. *Randolph*, 438 Mass. 290, 294 (2002); *Commonwealth* v. *Irving*, 51 Mass. App. Ct. 285, 291 n.5 (2001).

There was no evidence that Nicole's lies had any relationship whatsoever to the charges against the defendant. Further, "[i]t is well settled that an expert may not offer an opinion on a

witness's credibility." *Commonwealth* v. *Reed*, 417 Mass. 558, 561 (1994). Thus, Lovejoy's expert testimony as offered in the treatment records would have been inadmissible at trial. See *Commonwealth* v. *Montanino*, 409 Mass. 500, 504 (1991).

It is well established that a defendant has the right to present evidence that a prosecution witness is biased or has a motive to lie. *Commonwealth* v. *LaVelle*, 414 Mass. 146, 153 (1993). In order to justify its admission, however, the defendant must establish that the evidence is sufficiently plausible and probative of bias or motive to lie. *Commonwealth* v. *Tam Bui*, 419 Mass. 392, 401, cert. denied, 516 U.S. 861 (1995). Here, the defendant failed to show, even in the slightest degree, that the excluded notations established that somehow Nicole was biased against the defendant or had a motive to lie about the defendant's sexual assaults on her.

We note that the judge did not foreclose all inquiry into the treatment records. Most of the records were introduced in evidence and the judge allowed the defense expert to testify as to his interpretations of the records; those interpretations were hostile to Nicole's mental stability. Further, Nicole admitted on cross-examination that she told several lies to her foster parent and investigators about certain details of the sexual assaults (see note 2, *supra*). Therefore, we hold that there was no error committed by the judge in excluding the notations.

2. *Other issues.* The remaining issues warrant only summary treatment.

The judge did not commit error when, after a voir dire hearing, she excluded testimony as to Nicole's poor reputation for truth and veracity. The judge recognized that when dealing with the reputation of a child, such as Nicole, the community from which reputation evidence is drawn is more circumscribed than when dealing with the reputation of an adult. See *Commonwealth* v. *Healey*, 27 Mass. App. Ct. 30, 39 (1989).

We agree with the judge that based on the testimony at the voir dire hearing, the reputation evidence was properly excluded because an inadequate foundation was laid for its admission. The offered evidence was not of Nicole's general reputation but rather the private opinions of too few persons, and those persons only reported specific instances of Nicole's lying to them.

The defendant also claims that the judge committed error when she excluded evidence of a DSS report that Nicole may have sexually assaulted another child. The defendant claims he was prejudiced because the report showed that Nicole may have fabricated the allegations of sexual assault against the defendant in order to take the police's attention away from her own crime.

The judge held a voir dire as to the admissibility of the report. The testimony demonstrated that the report to DSS was unsubstantiated and did not result in any police investigation or criminal charges. More specifically, the defendant was unable to show how Nicole would be motivated to fabricate charges against the defendant in order to avoid being charged, herself, with sexual assault. See *Commonwealth* v. *Allen*, 29 Mass. App. Ct. 373, 379 (1990). The allegations against the defendant were clearly unrelated to any desire of Nicole to avoid prosecution. *Id.* at 378. There was no error in excluding the evidence.

The defendant also claims that in discovery the Commonwealth failed to disclose two statements of the defendant that were used at trial. One concerns a statement to Maura that the defendant had asked her to lean over him to reach for candy. The other concerned the defendant's statement to Kountz that he had given Nicole permission to go into his office when he was not there. The defendant argues that the failure to provide him with the two statements deprived him of a fair trial.

The judge struck the first statement and instructed the jury not to consider it. As to the second statement, the judge ruled that the "essence" of that statement was reflected in the grand jury minutes that had been given to the defendant. We agree with the Commonwealth that the defendant's argument fails because "[i]t is not a violation of a pretrial discovery agreement if a witness's testimony 'differs somewhat' from a report provided to the defense." *Commonwealth* v. *Bregoli*, 431 Mass. 265, 271 (2000). There was no error.

*Judgments affirmed.*